**Reverse and Render in part, and Remand in part; Opinion Filed August 5, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00353-CV

**MRC PERMIAN COMPANY AND JOE FORAN, Appellants**
**V.**
**THREE RIVERS OPERATING COMPANY AND THREE RIVERS ACQUISITION LLC, Appellees**

On Appeal from the 14th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-12-12637-A

## MEMORANDUM OPINION

Before Justices Fillmore, Myers, and Evans
Opinion by Justice Myers

Appellants MRC Permian Company and Joe Foran appeal from a summary judgment granted in favor of appellees Three Rivers Operating Company and Three Rivers Acquisition, LLC, and the denial of appellants' summary judgment motion. In two issues, appellants argue that (1) the trial court erred by granting summary judgment requiring MRC and Foran to buy ten properties for $14.2 million, and (2) the trial court erred by denying appellants' motion for summary judgment for enforcement of a $6.9 million contract. We reverse and render in part, and remand in part.

### BACKGROUND AND PROCEDURAL HISTORY

#### Three Rivers' Sale Agreement With COG Operating

In May of 2012, appellee Three Rivers Acquisition entered into a Purchase and Sale

Agreement (PSA) to sell various oil and gas properties to COG Operating, LLC (COG). Among the properties covered by the PSA were ten located in Lea County, New Mexico. Three Rivers Acquisition owned a working-interest share in these properties, while appellee Three Rivers Operating Company operated the properties. The PSA established an allocated purchase price of $14,243,424 for the properties in Lea County.

Before the deal could be finalized, however, Three Rivers was required by a March 1984 Joint Operating Agreement (JOA)[1] to first give MRC Permian Company (MRC) and Joe Foran, the president of MRC, an opportunity to exercise preferential purchase rights to certain Lea County properties in which they owned working interests. Three Rivers and MRC are the successors to the original parties to the JOA.

### The Joint Operating Agreement

Neither party disputes that the ten Lea County properties fall under the JOA. According to the JOA, it applies to a "Contract Area" that is defined as the properties located in Lea County that are listed in exhibit A of the agreement.[2] The ten Lea County properties Three Rivers owns an interest in—the properties within the Contract Area that are listed in exhibit A of the PSA— are known as the "Contract Area properties." The list of Contract Area properties is as follows:

Eagle 2 State #1

Eagle 2 State #2

Eagle 2 State #3

Eagle 2 State #4

---

[1] "Operating agreements are commonly used in the oil and gas industry in New Mexico and other producing states to set forth the arrangement between interest owners as to the exploration and development of jointly owned interests." *See Nearburg v. Yates Petroleum Co.*, 943 P.2d 560, 563 (N.M. Ct. App. 1997).

[2] The JOA in this case states that the governing law under the agreement is the law of the state in which the Contract Area is located. Since the Contract Area is in New Mexico, New Mexico law governs the substantive issues in this lawsuit. Texas law governs the procedural issues. *See, e.g., Man Indus. (India), Ltd. v. Midcontinent Express Pipeline, LLC*, 407 S.W.3d 342, 352 (Tex. App.—Houston 2013, pet. denied) ("Even if a contract contains a choice-of-law provision in which the parties have agreed to apply the law of a different state, 'we as the forum will apply our own law to matters of remedy and procedure.'") (quoting *Autonation Direct.com, Inc. v. Thomas A. Moorehead, Inc.* 278 S.W.3d 470, 472 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). Where the parties do not point out to us the difference between Texas and New Mexico law, we may, but are not obligated to, take judicial notice of the law of New Mexico. *See* TEX. R. EVID. 202.

Eagle 2 State #5

Eagle 2 State #6H

Eagle 2 State #7H

Eagle 2 State #6

Eagle 2 State #7

Eagle 2 State #8[3]

Five of these properties are producing wells; five are undeveloped well sites. The five producing wells are Eagle 2 State #1; Eagle 2 State #2; Eagle 2 State #3; Eagle 2 State #4; and Eagle 2 State #5. The five well sites are Eagle 2 State #6H; Eagle 2 State #7H; Eagle 2 State #6; Eagle 2 State #7; and Eagle 2 State #8. MRC owned working-interest shares in three of the Contract Area properties: Eagle 2 State #2, Eagle 2 State #4, and Eagle 2 State #5. Appellant Joe Foran owned working-interest shares in those same three properties plus two more: Eagle 2 State #6H and Eagle 2 State #7H.

### *Preferential Purchase Rights*

The JOA contains a section giving each party to the agreement a preferential purchase right (PPR)[4] option to buy any other party's rights and interests in the Contract Area. Under the PPR provision, if any party wishes to sell its Contract Area properties to a third party, it must first give written notice to the other parties and provide "full information" regarding the proposed sale, and the other parties would then have an optional prior right "to purchase on the same terms and conditions the interest which the other party proposes to sell." The provision also states, however, that if the optional right is exercised, "the purchasing parties shall share the

---

[3] Footnote one of the trial court's final judgment identifies a total of fourteen properties, rather than ten. Four of those properties are identified as "PDNP," or "Proved Development Nonproducing": Eagle 2 State #1 (BP) PDNP, Eagle 2 State #1 PDNP, Eagle 2 State #3 (BP) PDNP, and Eagle 2 State #4 (BP) PDNP.

[4] *See McMillan v. Dooley*, 144 S.W.3d 159, 171 (Tex. App.—Eastland 2004, pet. denied) ("A preferential right of purchase, also known as a preemptive right or a right of first refusal, is a right granted to a party giving him or her the first opportunity to purchase property if the owner decides to sell it."); *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 524 (Tex. App.—Amarillo 1998, pet. denied) ("Preferential rights of purchase have a generally well understood meaning within the business world that the rightholder must be given an opportunity to purchase the property from the property owner on the terms offered by any third party.").

purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties." It reads as follows:

F. Preferential Right to Purchase

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, or a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

### *Three Rivers' May 21, 2012 Letters to MRC and Foran*

Pursuant to the PPR provision, on May 21, 2012, Three Rivers notified MRC and Foran of the proposed sale to COG and offered to sell its undivided interests in specific properties to each of them. Regarding Foran, Three Rivers offered to sell its interests in the following five properties:

Eagle 2 State #2

Eagle 2 State #4

Eagle 2 State #5

Eagle 2 State #6H

Eagle 2 State #7H

Three Rivers limited its offer to Foran to the five Contract Area properties in which Foran had an existing interest, and the letter to MRC was similarly limited to the first three of the properties listed above. The allocated price for the five properties was $6,961,881, and the allocated price for the three properties in which MRC owned an interest was $6,384,670.

–4–

As Three Rivers explained in the May 21 letters, the five properties were governed by the JOA, which gives other owners, like MRC and Foran, a preferential purchase right: "The JOA contains a preferential purchase right ('PPR') provision and we believe that you may have a PPR covering the Subject Property." Three Rivers' letters also stated: "To the extent that you do not have a valid PPR on the Subject Property, this letter is not an offer to sell, and nothing herein is intended or should be construed as granting you rights to which you are not contractually entitled." The letters set forth the steps MRC and Foran "must" take to exercise the PPR:

> In order to acquire the Subject Property subject to a valid PPR [preferential purchase right] and participate in the transaction contemplated by the Purchase Agreement, you must (i) indicate your election to make such acquisition and to so participate by checking the appropriate box below, execute and return one counterpart of this letter on or before the Tenth (10) day after your receipt of this notice (the 'Election Date'); and (ii) participate in the Closing and purchase the Subject Property on the terms and conditions set forth in the Purchase Agreement. If we do not receive a response from you on or before the Election Date or you fail to purchase the Subject Property at Closing, you will be deemed to have elected not to have exercised your PPR.

Both letters stated that "[a] copy of the Purchase Agreement redacted to exclude certain provisions not applicable to you and/or the Subject Property is enclosed with this notice." At the bottom of the letters, there were the two boxes in which MRC and Foran must insert a checkmark to show they elected to buy the properties.

### *MRC's and Foran's June 5, 2012 Letter to Three Rivers*

MRC and Foran received the May 21 letters on May 29, 2012. On June 5, 2012—within the ten-day window—they responded to Three Rivers. Their June 5 letter began by acknowledging the May 21 letters notifying Foran and MRC "of their right to exercise a preferential purchase option triggered by a pending Purchase Agreement with COG Operating LLC." MRC and Foran stated that they were exercising their preferential rights "on the same terms and conditions" contained in the agreement between Three Rivers and COG, and only exercising their preferential rights as to those properties that they were "entitled to purchase

–5–

under the JOA." MRC and Foran also stated, however, that they "make this election to purchase all of Three Rivers' interest in the Contract Area created by the subject JOA . . . even if the interest is not specifically listed in Exhibit A to the letter notices dated May 21, 2012." The relevant portion of the June 5 letter reads as follows:

> By this letter, and as contemplated by Article VIII.F of the referenced JOA, Mr. Foran and MRC Permian, individually and collectively, hereby exercise their preferential right to purchase, individually and collectively, one hundred percent (100%) of Three Rivers' interest in the lands comprising the Contract Area in the JOA, which is covered by the Purchase Agreement with COG Operating. Mr. Foran and MRC Permian agree that such interest will be purchased on the same terms and conditions as contained in the Purchase Agreement.
>
> Mr. Foran and MRC Permian make this election to purchase all of Three Rivers' interest in the Contract Area created by the subject JOA (as amended September 4, 1991), even if the interest is not specifically listed in Exhibit A to the letter notices dated May 21, 2012. Any interest being sold by Three Rivers not identified in Exhibit A to the letters, but subject to and within the Contract Area of the JOA, is included in the purchase election by Mr. Foran and MRC Permian.
>
> In light of this election to purchase, please keep Mr. Foran and MRC Permian promptly advised of any changes to the terms or conditions of the COG Purchase Agreement. We would also appreciate your immediately submitting to us a separate purchase agreement that tracks the terms and conditions of the COG Purchase Agreement, but covers only the interests that Mr. Foran and MRC Permian are entitled to purchase under the JOA. Mr. Foran and MRC Permian stand ready, willing and able to timely complete the exercise of their preferential purchase right.

The June 5 letter was "Approved and Agreed to" by both MRC and Foran. The letter enclosed a copy of the May 21 letter with a checkmark placed in the box indicating a desire to exercise the preferential purchase option:

## ELECTION



☐     I/We hereby elect <u>NOT</u> to exercise, and hereby waive, my/our PPR as to the Subject Property.

☑     I/We hereby elect to exercise my/our PPR as to the Subject Property under the same terms and conditions set forth in the Purchase Agreement.

### Three Rivers' June 12, 2012 Letter to MRC and Foran

In a letter to MRC and Foran dated June 12, 2012, Three Rivers acknowledged the May 21 letter that "offered certain properties pursuant to the preferential right provisions," but added that, under the JOA, "you may have the right to purchase different asset [sic] than were described in the" May 21 letters. The letter asked MRC and Foran to "please consider the [May 21 letters] withdrawn and this letter sent as a substitute." The June 12 letter reads in part as follows:

> In our letter dated May 21, 2012 (the 'Original Preferential Right Letter'), you were offered certain properties pursuant to the preferential right provisions of the above-referenced JOA. It has come to our attention that, under the JOA, you may have the right to purchase different asset [sic] than were described in the Original Preferential Right Letter. Therefore, please consider the Original Preferential Right Letter withdrawn and this letter sent as a substitute.
>
> Pursuant to that certain Purchase and Sale Agreement dated May 11, 2012 (the '<u>Purchase Agreement</u>'), Three Rivers Acquisition LLC and Three Rivers Operating Company LLC (collectively, '<u>Three Rivers</u>') have agreed to sell all of their interest in various properties to COG Operating LLC ('<u>COG</u>'), including their interest in the lands comprising the Contract Area created by the JOA and described on Exhibit A attached hereto (the '<u>Subject Property</u>'). Unless otherwise provided herein, all capitalized terms used herein have the meanings given in the Purchase Agreement.
>
> The JOA contains a preferential purchase right ('<u>PPR</u>') provision and we believe that you may have a PPR covering the Subject Property. This letter constitutes the PPR notice contemplated by the JOA. To the extent that you do not have a valid PPR on the Subject Property, this letter is not an offer to sell, and nothing contained herein is intended or should be construed as granting you rights to which you are not contractually entitled.
>
> The Allocated Value attributable to the Subject Property under the Purchase Agreement is $14,243,424. Any purchase of the Subject Property pursuant to the exercise of the PPR will be subject to (i) the terms and conditions

of the Purchase Agreement, including all representations and obligations of Purchaser therein and (ii) a Closing on the date determined in accordance with Section 8.1 of the Purchase Agreement. In addition to your assumption of any representations or obligations created by the Purchase Agreement and applicable to the Subject Property purchased by you, pursuant to a valid PPR, at Closing you will assume all Assumed Obligations attributable to the Subject Property purchased by you.

The ten properties, which are listed in an appendix to the letter, are as follows:

Eagle 2 State #1

Eagle 2 State #2

Eagle 2 State #3

Eagle 2 State #4

Eagle 2 State #5

Eagle 2 State #6H

Eagle 2 State #7H

Eagle 2 State #6

Eagle 2 State #7

Eagle 2 State #8

Three Rivers' price for the above ten properties was $14,243,424.[5]   As in the May 21 letters, Three Rivers again specified the steps MRC and Foran *must* take to accept the June 12 offer:  (1) "indicate your election by . . . checking the appropriate box below," (2) "execute and return one counterpart of this letter to us on or before the Tenth (10) day after your receipt of this notice," and (3) "participate in the Closing and purchase the Subject Property on the terms and conditions set forth in the Purchase Agreement" between Three Rivers and COG.

### *MRC's and Foran's June 25, 2012 Letter to Three Rivers*

Writing on behalf of both himself and MRC, Foran responded to Three Rivers in a June

---

[5] Three Rivers' valuation included the four PDNP properties noted earlier:  Eagle 2 State #1 (BP) PDNP, Eagle 2 State #1 PDNP, Eagle 2 State #3 (BP) PDNP, and Eagle 2 State #4 (BP) PDNP.

25, 2012 letter. The letter began by stating that Foran and MRC were "still ready, willing, and able" to exercise their preferential purchase option in accordance with the June 5 letter. The relevant portion of the June 25 letter reads as follows:

> MRC Permian Company and I, individually and collectively, are still ready, willing and able to exercise our preferential purchase option triggered by a certain Purchase Agreement with COG Operating LLC in accordance with its terms and conditions as indicated by our letter to Three Rivers Operating Company LLC dated June 5, 2012.
>
> From reading the correspondence and the exchange of documents, it appears to me that there are some different interpretations of what that preferential right covers and how it is to be exercised. The land and leasehold covered by this preferential right are complicated especially due to extensive horizontal and vertical separation of the base leases and the JOA contract area. As a result, it probably makes a lot of sense for Three Rivers, Concho, MRC Permian and I to get together to resolve these differences, if any. Previously, MRC Permian and I requested a separate purchase agreement that tracks the terms and conditions of the COG purchase agreement but covers only the interest that we are entitled to purchase under the JOA. We have not yet received such an agreement.
>
> We understand that this is a small part of a much larger transaction and we do not wish to assert any rights that we do not have, but we want to be sure to receive full consideration of our preferential rights for the limited properties that it covers. Accordingly, please feel free to give me a call to discuss this directly or please suggest some times when we can get together. In addition, I am happy to send an authorized representative to your office to try to confirm what our preferential rights cover or to work out any differences. Please let me know what you wish to do.

MRC and Foran did not check the boxes on the June 12 letter indicating an election and did not return the counterpart of the letter, nor did they indicate that they would participate in the closing on the properties.

### *The Litigation*

Believing MRC had agreed to buy all ten of the Contract Area properties, COG excluded those properties when closing the sale to COG. MRC subsequently refused Three Rivers' demand that it perform the purported $14.2 million deal. On October 25, 2012, MRC and Foran brought suit against Three Rivers for declaratory judgment, breach of contract, specific performance, and damages. MRC asserted there was a binding and enforceable contract to

–9–

acquire the five properties identified in the May 21 letters for $6,961,881. Three Rivers answered and counterclaimed for declaratory judgment, breach of contract, specific performance, and damages. Three Rivers alleged MRC's and Foran's June 25 letter accepted Three Rivers' June 12 offer and formed a binding contract under which MRC and Foran would purchase the ten Contract Area properties listed in the June 12 letter for $14,243,424.

The parties filed cross-motions for summary judgment. MRC and Foran argued—based on the returned May 21 letters with a checkmark placed in the box indicating a desire to exercise the preferential purchase option—that there was a binding and enforceable contract to acquire Three Rivers' interest in the five properties listed in the May 21 letters for $6.9 million, i.e., Eagle 2 State #2, Eagle 2 State #4, Eagle 2 State #5, Eagle 2 State #6H, and Eagle 2 State #7H, for $6.9 million. Three Rivers maintained that the preferential rights provision applied to all ten of the Contract Area properties, not just the five specified in the May 21 letters, and that those letters "mistakenly did not . . . include all the oil and gas interests that the preferential right provision covered." It argued that MRC's and Foran's June 5 letter rejected Three Rivers' May 21 offer by counteroffering to purchase all ten of the properties, that Three Rivers sent an amended $14.2 million offer that "correctly included all of the interests subject to the preferential right," and that MRC and Foran accepted the "amended offer" in the June 25 letter.

The trial court granted Three Rivers' motion for summary judgment and denied MRC's motion. The court entered a judgment for Three Rivers, requiring MRC to specifically perform the $14.2 million contract. The court also awarded Three Rivers attorneys' fees of $318,978 for the trial court proceedings and up to $205,000 for appeals. This appeal followed.

## DISCUSSION

### *The Parties' Contentions*

MRC and Foran bring two issues. MRC's and Foran's first issue argues there is no $14.2

million contract as a matter of law and that, alternatively, fact issues preclude the finding of such a contract. MRC and Foran also argue that Three Rivers is not entitled to attorneys' fees. MRC's and Foran's second issue contends the trial court erred by denying their motion for summary judgment for enforcement of the $6.9 million contract based on the May 21 offer, and that MRC and Foran are entitled to recover their costs and reasonable and attorneys' fees.

MRC's and Foran's argument is that they accepted Three Rivers' May 21 offer in the June 5 letter by checking the second box, thereby indicating acceptance of the $6.9 million price for the five properties, and returning the letters as instructed. They contend this constituted acceptance as a matter of law. Later, Three Rivers sent MRC and Foran a "second offer" on June 12 to sell all ten properties for $14.2 million, again instructing them to check the box to indicate acceptance of the terms and return the letter as indicated. But MRC and Foran did not check the box or return the counterpart of the letter. As a result, according to MRC and Foran, there was no $14.2 million contract as a matter of law. They did not accept Three Rivers' June 12 offer because they never complied with the method of acceptance required by Three Rivers (i.e., checking the appropriate boxes and returning the letter), nor did they provide a positive and unconditional acceptance of the material terms of the June 12 offer. Furthermore, MRC and Foran contend there was no meeting of the minds regarding which properties were covered by the June 12 offer, and that the parties did not agree on two key terms—the properties and price identified in the offer. Alternatively, MRC and Foran argue there are issues of material fact because the parties disagree about how to interpret the preferential purchase rights provision and which properties MRC and Foran had a preferential right to purchase, thus precluding the trial court from determining as a matter of law that MRC and Foran accepted the "second offer," assented to its terms, and entered into contract to purchase all ten of the Contract Area properties for $14.2 million.

Three Rivers, however, argues it was a mistake to offer to sell only the five Contract Area properties for $6.9 million and that, under the preferential rights provision, it should have offered to sell MRC and Foran all ten of the Contract Area properties at the PSA price of $14.2 million. Three Rivers maintains there was a $14.2 million contract to purchase all ten of the Contract Area properties because MRC's and Foran's June 5 letter was actually a counteroffer to buy all ten of the Contract Area properties for the PSA sale price of $14.2 million, and Three Rivers accepted this counteroffer in its June 12 letter. Alternatively, Three Rivers offered the $14.2 million contract in its June 12 letter and MRC and Foran accepted this offer in their June 25 letter, which incorporated the June 5 letter by reference. As for the 6.9 million dollar contract alleged by MRC and Foran, Three Rivers contends the June 5 letter was actually a rejection of the May 21 offer because it did not precisely mirror the offer, and that the June 5 response was merely a counteroffer—a legal rejection of the original offer. Three Rivers also maintains that, even if we accept MRC's and Foran's argument that a $6.9 million contract was formed, the trial court reached the correct result because, first, any $6.9 million contract was superseded by a later contract to sell all of the properties for $14.2 million. Second, any $6.9 million contract was augmented by a second contract for the other five properties for $7.3 million, and the sum of the two agreements is equivalent to the amount the trial court awarded.

### *Standard of Review*

The standard of review for a traditional summary judgment is well known. *See* TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). We review a trial court's decision to grant or deny a motion for summary judgment de novo. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007) (citing standard for appellate review of grant of summary judgment and denial of cross-motion for summary judgment). We must determine whether the movant demonstrated that no genuine issues of

material fact existed and it was entitled to judgment as a matter of law. *See Nixon*, 690 S.W.2d at 548–49. Although a denial of summary judgment normally is not reviewable, we may review such a denial when, as in this case, both parties moved for summary judgment and the trial court granted one motion and denied the other. *See Tex. Mun. Power Agency*, 253 S.W.3d at 192. In our review of such cross-motions, we review the summary judgment evidence presented by each party, determine all questions presented, and render the judgment that the trial court should have rendered. *Id*.

### A $6.9 Million Contract

"Ordinarily, to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Hartbarger v. Frank Paxton Co*., 857 P.2d 776, 780 (N.M. 1993). "Mutual assent is based on objective evidence, not the private, undisclosed thoughts of the parties. In other words, what is operative is the objective manifestations of mutual assent by the parties, not their secret intentions." *Pope v. The Gap*, Inc., 961 P.2d 1283, 1287 (N.M. Ct. App. 1998) (citations omitted); *see also* 1 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 4:1 (4th ed. 1991) (hereafter "WILLISTON ") ("[S]ecret, subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties.").

"The rule is that an offer becomes a binding promise and results in a contract only when it is accepted." *Orcutt v. S & L Paint Contractors, Ltd*., 791 P.2d 71, 73 (N.M. Ct. App. 1990); *McCoy v. Alsup*, 609 P.2d 337, 341 (N.M. Ct. App. 1980). A proposal by an offeror is not effective, and is not an "offer," until it is made known to the other party, who is then in the position to accept or reject it. *Foster v. Udall*, 335 F.2d 828, 831 (10th Cir. 1964). In the formation of a contract, the offeror is entitled to know in clear terms whether the offeree accepts

the proposal. *Ross v. Ringsby*, 614 P.2d 26, 29 (N.M. Ct. App. 1980). "Acceptance of an agreement is essential for the agreement to be binding." *DeArmond v. Halliburton Energy Servs., Inc.*, 81 P.3d 573, 578 (N.M. Ct. App. 2003). The acceptance must be "clear, positive, and unambiguous" in order to result in a binding contract. *See Tatsch v. Hamilton–Erickson Mfg. Co.*, 418 P.2d 187, 189 (1966). In addition, for an offer and acceptance to create a binding contract, there must be an objective manifestation of mutual assent by the parties to the material terms of the contract. *Alcantar v. Sanchez*, 257 P.3d 966, 973 (N.M. Ct. App. 2011); *Pope*, 961 P.2d at 1287. "Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer; but it is not an acceptance and consummates no contract." 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 3.28 (Rev. ed. 1993) (hereafter "CORBIN").

A preferential right is a form of an option; it gives the option holder the first opportunity to buy the specified property if the owner decides to sell to a third party. *See Barela v. Locer*, 708 P.2d 307, 309 (N.M. 1985); *see also McMillan v. Dooley*, 144 S.W.3d 159, 171 (Tex. App. —Eastland 2004, pet. denied) ("A preferential right is essentially a dormant option."). "It requires the property owner, before selling it to another, to offer it to the rightholder on the terms and conditions specified in the contract granting the right." *McMillan*, 144 S.W.3d at 171. "When the property owner expresses his or her intention to sell, the rightholder must elect to either purchase the property or decline to purchase it and allow the property owner to sell it to another." *Id*. at 172. "The holder of such a right has no right to compel a sale or to prevent a sale but only has the right to be offered the property if and when the owner decides to sell." *Id*.

"An option must be exercised strictly according to its terms." *Master Builders, Inc. v. Cabbell*, 622 P.2d 276, 279 (N.M. Ct. App. 1981). "The necessity for unequivocal and unqualified expression of intention to exercise an option and affirmative performance of the

–14–

expressed method of exercising it are well-established legal principles. The language of the agreement itself controls as to what act or acts constitute an election to exercise an option." *Northcutt v. McPherson*, 473 P.2d 357, 359 (N.M. 1970) (citations omitted). "In an option contract, with the requirement of its exercise in writing, the rule is that its terms must be fully and completely accepted in all its parts, and its provisions strictly complied with, before it becomes an executory contract." *Cillessen v. Kona*, 387 P.2d 867, 870 (N.M. 1964); *see also Northcutt*, 473 P.2d at 359–60. "'An offeror is entitled to know in clear terms whether the offeree accepts his proposal. It is not enough that the words of a reply justify a probable inference of assent.'" *Cillessen*, 387 P.2d at 870 (quoting *Polhamus v. Roberts*, 175 P.2d 196, 198 (N.M. 1946) (quoting RESTATEMENT OF THE LAW OF CONTRACTS § 58 cmt. a (1932))); *see also Orcutt*, 791 P.2d at 73.

Another well-established principle of contract law is that the offeror controls the offer and the terms of acceptance. An acceptance is not valid, and does not create a contract, if it fails to comply with the "place, time or manner of acceptance" specified in the offer. *See* RESTATEMENT (SECOND) OF CONTRACTS § 60 (Am. Law Inst. 1981) (hereafter "RESTATEMENT (SECOND) OF CONTRACTS") ("If an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with in order to create a contract."); 1 CORBIN § 3.34 ("The offeror creates the power of acceptance and has control over the character and extent of the power that is created by the offer. The offeror can prescribe a single and exclusive mode of acceptance."); 2 WILLISTON § 6:12 ("[T]he manner of acceptance may be specified in the offer, as a condition to acceptance, in which case it must be complied with in order for a contract to be formed."); *see also Picket v. Miller*, 412 P.2d 400, 402 (N.M. 1966) ("[I]t is recognized that where an offer prescribes a manner of acceptance, that manner must be complied with in order to create a valid contract."); *Town of Lindsay v. Cooke Co. Elec. Co-op. Ass'n*, 502 S.W.2d 117,

118 (Tex. 1973) ("Where . . . an offer prescribes the time and manner of acceptance, its terms in this respect must be complied with to create a contract."); *Navasota Res., L.P. v. First Source Tex., Inc.*, 249 S.W.3d 526, 530, 540 (Tex. App.—Waco 2008, pet. denied) (where preferential rights holder complied with specified method of acceptance, a valid contract was created); *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 525 (Tex. App.—Amarillo 1998, pet. denied) ("It is an established rule of contracts that when a specific mode of acceptance is given within an offer, the offeree must convey his acceptance in the precise mode expressed within the offer in order to create a binding agreement."); *Conrad v. Hebert*, No. 01–09–00331–CV, 2010 WL 2431461, at *3–5 (Tex. App. —Houston [1st Dist.] June 17, 2010, pet. denied) (mem. op.) (holding rule 11 agreement not binding because acceptance was not in strict compliance with terms of offer, which "were clear and unambiguous"); *W. Tex. Gas, Inc. v. Carthel Bros.*, No. 07–06–01688–CV, 2007 WL 3194560, at *4 (Tex. App.—Amarillo Oct. 30, 2007, no pet.) (mem. op.) (no acceptance where buyer "did not comply with the express terms of WTG's offer," which required "executing the attached gas sales agreement" as mode of acceptance). As another treatise has explained:

> Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium that is reasonable under the circumstances. However, the offeror controls the terms of acceptance, and an acceptance is often defined as a manifestation of assent to the terms of an offer, made by the offeree in the manner invited or required by the offer. The offeror may prescribe conditions as to the mode of acceptance.

17A Am. Jur. 2d *Contracts* § 92 (2015) (footnotes omitted).

Three Rivers' original May 21 offer to Foran identified five properties that were being offered and stated that the price for those properties was $6,961,881. The letter specified that the offer was subject to "the terms and conditions of the Purchase Agreement" between Three Rivers and COG, a redacted copy of which was included with the offer letter. Three Rivers' May 21 letters also specified the steps MRC and Foran *must* take to accept the offer: (1) "indicate your

election by . . . checking the appropriate box below," (2) "execute and return one counterpart of this letter" in ten days, and (3) "participate in the Closing and purchase the Subject Property on the terms and conditions set forth in the Purchase Agreement" between Three Rivers and COG.

MRC and Foran complied with the specified terms of acceptance by checking the second box on the letters they received, returning the counterparts within ten days of receipt, and agreeing to participate in the closing on the specified terms and conditions. Their June 5 cover letter stated that they were exercising "their preferential right to purchase, individually and collectively, one hundred percent (100%) of Three Rivers' interest in the lands comprising the Contract Area in the JOA." The letter added that MRC and Foran were purchasing the interests "on the same terms and conditions as contained in the Purchase Agreement" between Three Rivers and COG, and, "[i]n light of this election," they asked to be "promptly advised of any changes to the terms and conditions of the COG Purchase Agreement." They also asked Three Rivers to prepare a separate purchase agreement tracking "the terms and conditions of the COG Purchase Agreement," but covering "only the interests that Mr. Foran and MRC Permian are entitled to purchase under the JOA."

Three Rivers argues that the June 5 letter was actually a rejection of the original May 21 offer and a counteroffer because it did not mirror the terms of the original offer. It focuses on the following statements in the June 5 letter:

> Mr. Foran and MRC Permian, individually and collectively, hereby exercise their preferential right to purchase, individually and collectively, one hundred percent (100%) of Three Rivers' interest in the land comprising the Contract Area. . . .

> Mr. Foran and MRC Permian make this election to purchase all of Three Rivers' interest in the Contract Area. . . , even if the interest is not specifically listed in [the May 21 letters].

> Any interest being sold by Three Rivers not identified in [the May 21 letter], but subject to and within the Contract Area . . . , is included in the purchase election by Mr. Foran and MRC Permian.

–17–

Three Rivers also argues: "Rather than accepting the offer of five properties, MRC demanded all Contract Area Properties in accordance with the preference right and under the terms of the PSA. MRC expressly required *all* Contract Area Properties, *even those not listed in the May 21 letter*."

But as suggested by several of the cases cited by Three Rivers, a more precise reading of the June 5 letter is that MRC and Foran did not specifically condition acceptance of Three Rivers' offer to sell the original properties upon assent to the purchase of additional properties. *Cf. Tatsch*, 418 P.2d at 190 (offeree accepted offer of products "if they were approved by the architect"); *Polhamus*, 175 P.2d at 198 (offeree accepted offer but "added the condition that a written lease be made to third persons to whom he was assigning his 'lease rights.'"); *Master Builders, Inc. v. Cabbell*, 622 P.2d 276, 279 (N.M. Ct. App. 1980) (offeree accepted offer but "insist[ed]" that he receive a brokerage commission). It is well settled that "[a]n acceptance which requests a change or addition to the terms of the offer is not thereby invalidated unless the acceptance is made to depend on an assent to the changed or added terms." RESTATEMENT (SECOND) OF CONTRACTS § 61. This rule has been expressed as follows:

> Frequently an offeree, while making a positive acceptance of the offer, also makes a request or suggestion that some addition or modification be made. *So long as it is clear that the offeree is positively and unequivocally accepting the offer, regardless of whether the request is granted or not, a contract is formed. Thus, a request for a modification of the offer coupled with an otherwise unqualified acceptance, which does not depend on the offeror's assent to the requested change, operates as an acceptance, and a contract is thereby formed.* Neither will an inquiry as to the meaning of an offer or a request for an explanation invalidate a positive acceptance, so long as, on fair interpretation, the inquiry or request is not to be understood as undercutting the positive expression of acceptance. It has even been held that a complaining acceptance may be effective.

2 WILLISTON § 6:16 (emphasis added) (footnotes omitted); *see also* 1 CORBIN § 3.30 ("An acceptance is not invalidated by the fact that the offeree, in the same letter, makes an offer to buy additional goods, if it is clear that this new offer is wholly independent of the acceptance."). The Restatement provides the following example:

–18–

> A offers to sell specified hardware to B on stated terms. B replies: "I accept your offer; ship in accordance with your statement. Please send me also one No. 5 hand saw at your list price." The request for the saw is a separate offer, not a counter-offer.

RESTATEMENT (SECOND) OF CONTRACTS § 61, ill. 2. However, an acceptance that is conditioned on terms at variance with those in the offer operates as a counteroffer and terminates the original offer. *Id.* § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."); 1 CORBIN § 3.28 ("Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer.").

We agree with MRC and Foran that their June 5 letter did not condition their acceptance, and therefore did not convert their acceptance of the May 21 offer into a rejection or counteroffer. By checking the appropriate boxes and returning the counterparts according to the method of acceptance specified in the offer, MRC and Foran unequivocally "elect[ed] to exercise my/our PPR as to the Subject Property," i.e., the properties in the original offer.[6] The statements in the June 5 letter that MRC and Foran wanted "to purchase all of Three Rivers' interest" they were "entitled to purchase under the JOA" did not negate the acceptance because they lacked any qualifying, conditional, or demanding language. The June 5 letter did not, for example, state that the election was conditioned upon other interests being offered or Three Rivers' taking some other action. *See Polhamus*, 175 P.2d at 198–99 (defendant could accept lease offer unconditionally and could request as favor that written lease be made to two named assignees, but acceptance with condition that written lease be made to the two assignees was not unconditional acceptance giving rise to enforceable agreement).

---

[6] Of the five additional properties included in the June 12 offer, it was MRC's and Foran's position that they had no preferential rights to buy three of them: Eagle 2 State #1, Eagle 2 State #3, and Eagle 2 State #6. No value was allocated to the other two properties: Eagle 2 State #7 and Eagle 2 State #8.

Three Rivers also argues that certain language in the June 5 letter served as a counteroffer, or a "rejection of the original offer." *See Shelton v. Sloan*, 977 P.2d 1012, 1017 (N.M. Ct. App. 1999) ("As a general rule, a counteroffer is treated as a rejection of the offer, freeing the offeror of any obligation under the offer); *see also Corr v. Braasch*, 639 P.2d 566, 568 (N.M. 1981). But MRC and Foran could not offer to buy properties for which Three Rivers had not yet provided notice of intent to sell, and for which the preferential purchase rights had not yet been triggered. *See Gartley v. Ricketts*, 760 P.2d 143, 145 (N.M. 1988) ("A right of first refusal . . . 'does not give to the pre-emptioner the power to compel an unwilling owner to sell, but merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-emption at the stipulated price, and upon receiving such an offer, the pre-emptioner may elect whether he will buy, and if he elects not to buy, then the owner of the property may sell to a third party.'") (quoting *Barnhart v. McKinney*, 682 P.2d 112, 117 (Kan. 1984) (quoting *Anderson v. Armour & Co.*, 473 P.2d 84, (Kan. 1970))); *see also City of Brownsville v. Golden Spread Elec. Co-op, Inc.*, 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied) ("When the property owner gives notice of his intent to sell, the right of first refusal matures or 'ripens' into an enforceable option."); *Abraham Inv. Co.*, 968 S.W.2d at 524 ("Once the property owner conveys the terms of the offer to the rightholder, the rightholder then has the power to accept or reject the offer."). The June 5 letter also lacked the essential terms that would be necessary for a counteroffer, such as identity of properties and the price of those properties.

Additionally, the authorities we discussed earlier apply here: an acceptance that merely reserves rights or expresses an interest in buying more items "is not thereby invalidated *unless the acceptance is made to depend on an assent to the changed or added terms*." RESTATEMENT (SECOND) OF CONTRACTS § 61 (emphasis added); *see* 2 WILLISTON § 6:16; 1 CORBIN § 3.30. As the authors of the Restatement note, a "qualified or conditional acceptance" that "purports to

accept the original offer but makes acceptance expressly conditional on assent to additional or different terms" operates as a counteroffer, but "[a] mere inquiry regarding the possibility of different terms, a request for a better offer, or a comment upon the terms of the offer, is ordinarily not a counter-offer." *See* RESTATEMENT (SECOND) OF CONTRACTS § 39, cmt. b; *cf. Gardner Zemke Co. v. Dunham Bush, Inc.*, 850 P.2d 319, 320, 322 (N.M. 1993) (offeree's response to offer with acknowledgement containing "extensive warranty disclaimers" turned it into counteroffer under common law); *Corr*, 639 P.2d at 568 (offerees responded to offer by demanding that broker reduce commission, turning response into counteroffer); *W. Tex. Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554, 1567 n.16 (5th Cir. 1990) (offeree responded to offer but removed a key term, approval by Federal Trade Commission, that could have converted response into counteroffer, but offeree later acquiesced to the term). MRC's and Foran's June 5 letter did not require Three Rivers to accept any new terms, remove a key provision, nor enter into a different agreement as a condition of acceptance. Therefore, we conclude the June 5 letter was not a rejection or counteroffer and did not invalidate MRC's and Foran's acceptance of the May 21 offer. *See, e.g., Navasota*, 249 S.W.3d at 540; *Abbeville Offshore Quarters, Inc. v. Taylor Energy Co.*, 286 F. App'x 125, 126–27 (5th Cir. 2008) (offeree did not make counteroffer because offeree did not limit or condition acceptance of contract; in executing and returning contract, it merely requested that addendum be included in contract); *Best Foam Fabricators, Inc. v. United States*, 38 Fed Cl. 627, 636 (Fed. Cl. 1997) (bidder's request for removal of stringent inspection requirements was not counteroffer and did not invalidate acceptance of United States' offer for contract to produce prototypes of foam fuel cells for naval helicopters).

Three Rivers makes two additional arguments. It argues that MRC and Foran could not accept the original offer to buy five properties in that the parties could not form a binding

contract to sell only some of the properties because the preferential rights provision gave MRC the option "to purchase on the same terms and conditions that interest which [the property owner] proposed to sell." MRC and Foran could, thus, elect to buy either all or none of the properties. The preferential rights provision begins by stating that "[s]hould any party desire to sell all or any part of its interests under this agreement . . . ," and it also provides that other parties may then purchase "on the same terms and conditions the interest which the other party proposes to sell." While the preferential rights provision required Three Rivers to offer MRC and Foran the opportunity to purchase the interests in the Contract Area Properties which Three Rivers proposed to sell to COG, Three Rivers does not argue MRC and Foran had knowledge, at the time they responded to the May 21 letters, of the scope of the transaction between Three Rivers and COG. In the May 21 letters, Three Rivers offered to sell its interests in five specified properties to Foran, and its interests in three specified properties to MRC, and those offers were accepted based on the indicated method of acceptance.

Three Rivers also argues that, even if MRC and Foran accepted the May 21 offer of five properties at $6.9 million, MRC and Foran made an independent offer for the other five properties that Three Rivers then accepted in the June 12 letter, in which it stated that it would sell all the properties at the PSA price. According to Three Rivers, this means that the parties actually formed two contracts—a $6.9 million contract for five properties and a $7.3 million contract for the other five. Three Rivers concludes that since the net result of those two contracts is the same amount the trial court awarded, $14.2 million, we should affirm the summary judgment.

This argument suffers from several problems. First, the opening paragraph of the June 12 letter plainly states that Three Rivers is *withdrawing* the "Original Preferential Right Letter" and substituting a new offer of ten properties for $14.2 million. This language does not indicate

acceptance of any previous offer and, as we have already stated, it details how MRC and Foran *must* accept the June 12 new offer. Second, MRC's and Foran's June 5 letter—transmitting acceptance as required in the original offer—did not specify any additional properties or set out the prices for buying those properties, much less offer to buy the other five properties for $7.3 million. Third, Three Rivers' original offer provided MRC and Foran with a redacted copy of the sale agreement with COG in which the total transaction price was "blacked out," and the values for the other five properties were not provided. As a result, MRC and Foran could ascertain only the prices of the properties that were the subject of the original offer. Likewise, the preferential rights provision required Three Rivers, as the seller, to first "give written notice to the other parties" with "full information," including "the purchase price" and "all other terms," before the other parties could exercise their option to buy. Because Three Rivers did not provide such information about the additional properties until the June 12 letter, any option as to these properties could not have been triggered on June 5, and MRC and Foran lacked the right or the necessary information to buy the additional properties. *See Gartley*, 760 P.2d at 145; *see also City of Brownsville*, 192 S.W.3d at 880; *Abraham Inv. Co.*, 968 S.W.2d at 524. Lastly, the June 12 letter does not indicate recognition of a formed agreement regarding the properties identified in the May 21 letters together with extension of an offer for another five properties; it offered all ten properties as though no agreement had been formed around Three Rivers' May 21 offer letters. For these reasons, the June 12 letter is inconsistent with Three Rivers' argument that there were two deals, one for $6.9 million of five properties and a second for $7.3 million of five additional properties. We therefore sustain MRC's and Foran's second issue.

### A $14.2 Million Contract

We now turn to MRC's and Foran's first issue that the trial court erred by entering summary judgment requiring MRC and Foran to buy the ten Contract Area properties for $14.2

million—either because (1) there is no contract as a matter of law or (2) fact issues precluded finding there was a $14.2 million contract. As we stated earlier, Three Rivers' June 12 letter provided a specific mode of acceptance, identifying the steps MRC and Foran *must* take to accept the offer. That mode of acceptance was identical to the one detailed in the May 21 letters. MRC and Foran, however, did not follow the specified mode of acceptance: they did not check the appropriate boxes on the letter, sign and return the counterparts, or agree to participate in the closing on the terms indicated in the offer. In addition, the June 25 letter shows confusion—if not doubt—regarding the June 12 offer, noting that "it appears to me that there are some different interpretations of what that preferential right covers and how it is to be exercised"; the properties covered by the preferential right "are complicated"; and that "it probably makes a lot of sense for Three Rivers, Concho, MRC Permian and I to get together to resolve these differences, if any." Joe Foran, writing for both himself and MRC, invited the president of Three Rivers to "please feel free to give me a call to discuss this directly or please suggest some times when we can get together." This is far from an unqualified or unambiguous acceptance. *See, e.g., Northcutt*, 473 P.2d at 359 (there must be an "unequivocal and unqualified expression of intention to exercise an option"); *Tatsch*, 418 P.2d at 189 (acceptance must be "clear, positive, unambiguous"); *see also Austin Presby. Theo. Seminary v. Moorman*, 391 S.W.2d 717, 720–21 (Tex. 1965) ("The exercise of an option like the acceptance of any other offer must be positive and unequivocal.").

The June 25 letter begins by stating that "MRC . . . and I . . . are still ready, willing and able to exercise our preferential purchase option . . . in accordance with its terms and conditions as indicated by our [June 5] letter." Three Rivers focuses on this sentence to argue that the June 25 letter was actually an acceptance because it incorporated the June 5 letter, which had been returned according to the specified method of acceptance, and that the combination of the June 5

and June 25 letters operated as an acceptance of the June 12 offer. But as we noted previously, the June 25 letter lacks the sort of unequivocal, unqualified or unambiguous language required to constitute an acceptance of a new offer, and, in any event, the June 5 letter was an acceptance of an offer of five properties for $6.9 million—not a $14.2 million offer for ten properties. Moreover, as of June 5, Three Rivers had not yet sent the June 12 $14.2 million offer, and MRC and Foran could not accept an offer that had not yet been made. *See, e.g., Embree, Inc. v. Sw. Bell Media, Inc.*, 772 S.W.2d 209, 211 (Tex. App.—Dallas 1989, writ denied) ("An offer cannot be accepted before it is made.").

Three Rivers also emphasizes that the June 5 letter stated that MRC and Foran wanted to purchase "all of" Three Rivers' interests "on the same terms and conditions as contained in the Purchase Agreement" with COG. But MRC and Foran could not agree to a purchase price they did not yet know. As of June 5, Three Rivers had provided MRC and Foran with only a redacted copy of the sale agreement with COG. Three Rivers had not yet disclosed the prices allocated to the additional properties that were included with the June 12 offer, and MRC and Foran could not accept an offer to buy unnamed properties that had not yet been made. *See id.* Further, the June 5 letter was expressly limited to the "interests that Mr. Foran and MRC Permian are entitled to purchase," and the June 25 letter reiterated that their request for a separate purchase agreement covered "only the interest that we are entitled to purchase under the JOA."

Three Rivers further contends that MRC and Foran waived several of their arguments regarding the absence of an acceptance in the June 25 letter—checking the election boxes, signing the counterparts, agreeing to participate in the closing—because those arguments were not raised in the summary judgment papers. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."). According to the summary judgment record, however,

MRC and Foran made the following argument in their response to Three Rivers' motion for summary judgment: "It is undisputed that the Plaintiffs did not follow the Defendants' requested mode of acceptance—the Plaintiffs did not check the election box and did not return the offer to the Defendants. Thus, there was no acceptance as a matter of law."[7] As for the lack of a closing, MRC and Foran asserted in the next paragraph of their response that there was no acceptance because, among other things, the June 25 letter proposed "the parties get together 'to resolve these differences,'" which MRC and Foran point out in their reply brief is the "opposite of agreeing to participate in a closing." But the argument was not explicitly raised until the motion to reconsider, which stated, in a chart comparing the June 12 and June 25 letters, that "[d]efendants did not invite Plaintiffs to the Closing, and Plaintiffs did not participate in the Closing." Three Rivers hence argues that, under rule 54 of the rules of civil procedure, MRC and Foran had the burden to specifically plead the failure of "this alleged condition precedent to contract formation" because Three Rivers pleaded performance to all conditions precedent. *See* TEX. R. CIV. P. 54. Yet, we understand MRC's and Foran's argument to be that the lack of a closing simply illustrates there was no acceptance as a matter of law, not a failure of a condition precedent, and the absence of acceptance as a matter of law was raised in the summary judgment papers. An issue is "expressly" presented if the non-movant's written answer or response to the motion for summary judgment fairly appraises the trial court and movant of the issues the non-movant believes should defeat summary judgment. *See, e.g., Tello v. Bank One, N.A.*, 218 S.W.3d 109, 119 (Tex. App.—Houston [14th Dist.] 2007, no pet.). MRC's and Foran's response to Three Rivers' motion for summary judgment satisfies this standard.

It is a fundamental rule of contract law that an acceptance must comply with the terms of the offer. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 60; 1 CORBIN § 3.34; 2

---

[7] The statement appears under the following subheading: "The Plaintiffs did not accept the Substitute Offer as to the five additional wells."

WILLISTON § 6:12.  Where, as in this case, a party has specified a mode of acceptance, there cannot be an acceptance as a matter of law unless it is "in the precise mode expressed within the offer."  *Abraham Inv. Co.*, 968 S.W.2d at 525.  For this reason alone, the summary judgment as to the purported $14.2 million contract must be reversed as a matter of law.  *See, e.g., id.* (no contract where acceptance did not comply with specified mode of acceptance); *Conrad*, 2010 WL 2431461, at *3–5 (same); *W. Tex. Gas*, 2007 WL 3194560, at *4–5 (same).

Another general rule of contract law is that no contract is created unless the rightholder accepts all of the terms of the offer.  *See Corr*, 639 P.2d at 567 ("The acceptance must be to all terms."); *see also Abraham Inv. Co.*, 968 S.W.2d at 524–25; *Gasmark, Ltd. v. Kimball Energy Corp.*, 868 S.W.2d 925, 928 (Tex. App.—Fort Worth 1994, no writ).  Without a clear and positive acceptance of all terms, there cannot be a valid contract.  *See, e.g., Corr*, 639 P.2d at 568; *Tatsch*, 418 P.2d at 189–90; *Schriver v. Tex. Dep't of Transp.*, 293 S.W.3d 846, 851 (Tex. App.—Fort Worth 2009, no pet.) (no contract where response required modification to scope of interests acquired).  For this additional reason, we conclude the trial court erred as a matter of law by granting summary judgment and requiring MRC and Foran to purchase the ten properties for $14.2 million.  *See, e.g., Moorman*, 391 S.W.2d at 720; *Abraham Inv. Co.*, 968 S.W.2d at 524–25.  We therefore sustain MRC's and Foran's first issue.

### *Three Rivers' Attorneys' Fees*

The trial court also awarded Three Rivers $523,978 in attorneys' fees based on the purported $14.2 million contract.  Because we are reversing the summary judgment in Three Rivers' favor on its breach of contract claim and request for declaratory relief, and rendering judgment that Three Rivers take nothing, we necessarily conclude that the award of attorneys' fees must be reversed as well.  *See, e.g., Myers v. Hall Columbus Lender, LLC*, 437 S.W.3d 632, 640 (Tex. App.—Dallas July 17, 2014, no pet.) (citing *Morton v. Nguyen*, 412 S.W.3d 506, 512

–27–

(Tex. 2013)).

*Conclusion*

We reverse the trial court's summary judgment in favor of Three Rivers for $14,243,424 million and $523,978 in attorneys' fees and render judgment that Three Rivers take nothing. We reverse the trial court's denial of summary judgment in favor of MRC and Foran and render judgment in favor of MRC and Foran that there was a $6,961,881 million contract between the parties based on the five properties specified in the May 21 letters. We remand this cause to the trial court for a determination of MRC's and Foran's recoverable costs and reasonable attorneys' fees in accordance with this opinion. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (providing that court may award costs and reasonable and necessary attorneys' fees under Declaratory Judgments Act that are "equitable and just"); *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 723 (Tex. App.—Dallas 2011, pet. denied) (reversing and rendering judgment and remanding case for determination of recoverable attorneys' fees and costs of court).[8]

140353F.P05

/ Lana Myers/
LANA MYERS
JUSTICE

---

[8] In their petition, MRC and Foran sought recovery of their fees and costs pursuant to sections 37.009 and 38.001 of the civil practice and remedies code. As the prevailing parties, they are entitled to recover their costs and reasonable and necessary fees based upon their having brought suit under the Uniform Declaratory Judgements Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. Texas law provides that the Uniform Declaratory Judgments Act is procedural, not substantive. *See, e.g., Man Indus.*, 407 S.W.3d at 353–55; *Creative Thinking Sources, Inc. v. Creative Thinking, Inc.*, 74 S.W.3d 504, 513 (Tex. App.—Corpus Christi 2002, no pet.). Because the Act is procedural, it applies to this case even though New Mexico law governs the substantive issues. *See, e.g., Man Indus.*, 407 S.W.3d at 353–55. Whether MRC/Foran may recover attorneys' fees pursuant to section 38.001 is not before us, so we do not decide it.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MRC PERMIAN COMPANY AND JOE
FORAN, Appellants

No. 05-14-00353-CV        V.

THREE RIVERS OPERATING
COMPANY AND THREE RIVERS
ACQUISITION LLC, Appellees

On Appeal from the 14th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-12637-A.
Opinion delivered by Justice Myers. Justices
Fillmore and Evans participating.

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's judgment in favor of appellees for $14,243,424 million and $523,978 in attorneys' fees, and we **RENDER** judgment that appellees take nothing. We **REVERSE** the trial court's denial of summary judgment in favor of appellants and **RENDER** judgment in favor of appellants that there was a $6,961,881 million contract between the parties based on the five properties specified in the letters of May 21, 2012. We **REMAND** to the trial court for consideration of appellants' attorneys' fees. It is **ORDERED** that appellants **MRC PERMIAN COMPANY AND JOE FORAN** recover their costs of this appeal from appellees **THREE RIVERS OPERATING COMPANY AND THREE RIVERS ACQUISITION LLC**.

Judgment entered this 5th day of August, 2015.